5    493
30   137

## DICK COX *v.* THE STATE.

1. MURDER. — All murder committed with express malice is murder of the first degree, and all murder not of the first degree is murder of the second degree.

2. SAME — EXPRESS MALICE. — Express malice exists when the killing is done with a sedate, deliberate mind, and with a formed design to kill; which formed design is evidenced by external circumstances discovering

that inward intention, — as, lying in wait, antecedent menaces, former
grudges, and concerted schemes to do bodily harm. The killing must be
with a cool, composed mind, in pursuance of a formed design to kill, or to
inflict serious bodily harm which would probably end in the taking of the
life of the person killed, and in the absence of circumstances which
would reduce the offence to negligent homicide, or manslaughter, or
which would excuse or justify the homicide.

3. Evidence. — Note a state of proof held not sufficient to sustain a convic-
tion for murder in the first degree.

Appeal from the District Court of Walker. Tried below
before the Hon W. D. Wood.

The indictment charged the appellant with the murder of
P. W. Randolph, on February 8, 1878.

The State first introduced James Randolph, a cousin of
the deceased, who testified that himself, his brother John,
and one Bob Wiley were present at the mill of witness's
father, in Walker County, when the killing occurred. Wiley
was in or about the mill, and witness, his brother John, and
the deceased were lying on the ground, whittling with their
pocket-knives, when the appellant came up behind them
and said they ought to pay him for the turkey which the
dogs of the party had killed. Deceased replied, " Our
dogs did not kill your turkey ; it was my dog that did it."
Appellant said that he was in the habit of killing dogs that
killed his turkeys, and that if he was not paid for this tur-
key, somebody's dog would come up missing. Deceased
then said, " If you kill my dog, you had better hunt your
hole." When the deceased said this, appellant came
around by witness, drawing his knife, — a pocket-knife with
a blade about the length of witness's finger, — holding it with
the blade to the back of his hand, and stopped in front of
deceased, a step or two distant. He appeared to be very
angry, and said, " G—d d—n it, I will tell you I am a man,.
and won't be run over by any set of men." Witness then got.
up, and asked appellant what he meant by cursing and cut-

ting up so.   Witness's brother John then told appellant to
go away ; but he did not go.    Deceased then got up from
the ground and pushed the appellant with his left hand,
holding his pocket-knife in his right hand, down by his side,.
which knife had both end-blades open, and which were·
broken off and blunt, — the third of each blade broken off.
Deceased did not hold the knife in a threatening attitude ;:
did not strike with it, or attempt to, or do more than push
appellant with his left hand.    Appellant then cut and·
stabbed deceased in the right breast, striking one lick.
Deceased said he was killed.    Appellant, at the time, held·
the knife at about right angles to his body, his arm being·
drawn forward in a striking attitude.    The blood spurted
out from the wound, and deceased died in about two hours..
The appellant's knife was drawn and presented in a threat--
ening attitude when deceased got up.    Appellant left, after·
the stabbing, and was afterwards arrested in Leon County.
The deceased, when he got up, did not appear angry, nor·
did he speak in an angry manner when he told appellant he·
would have to hunt his hole if he killed his (deceased's) dog.
Appellant did not retreat or give back during the difficulty.
The witness was present some three weeks before, when
deceased's dog killed or injured the appellant's turkey.
They were driving stock by appellant's house, when the dog·
got after the turkey and crippled or killed it.    Deceased·
whipped the dog, and tried to pull him off from the turkey.
During the conversation on the evening of the killing, appel--
lant said he ate the turkey ; and deceased, after telling him.
that he whipped the dog at the time, and tried to keep him·
from injuring the turkey, said he did not think, since appel--
lant had eaten the turkey, that he (deceased) ought to pay·
·for it.

On cross-examination, witness said that both appellant.
and deceased cursed a good deal.    Witness's brother John.
called to witness, and told him to come away or go away,.

and have nothing to do with the difficulty. Wiley was in the mill during the occurrences narrated. Witness, when he got up from the ground, had his knife in his hand. Deceased did not strike appellant, but pushed him with his left hand, when appellant stabbed him.

John Randolph testified, for the State, that he was present at the killing. Some three weeks previous, himself, James Randolph, and deceased were driving stock past the house of the appellant, when deceased's dog ran after appellant's turkey, and either killed or crippled it. Deceased whipped the dog, and tried to pull him off the turkey. On the evening of the killing, the same three were lounging on the ground in front of the mill, where they all worked, whittling with their knives,— two blades of the knife of deceased opened at either end of the handle, and about one-third of each was broken off. Appellant came up behind them, and said their dogs had killed his turkey and he ought to be paid for it. Deceased said, "Don't say 'we;' it was *my* dog that did it." Appellant said he was in the habit of killing dogs that killed his turkeys. Deceased answered that he had beaten his dog and tried to keep him off the turkey. Appellant answered, "As it was your dog, I reckon I'll have to let him off," and turned away. Deceased said, "I reckon you will have to let him off;" and appellant turned back and said, "If I don't get pay for my turkey, somebody's dog will come up missing;" to which the deceased answered, "You kill my dog, and you had better hunt your hole." Appellant then cursed, and said, "By G—d, gentlemen, I'll let you know I am a man," and came back from behind; when witness's brother James got up, and appellant drew his knife, opened it, and took position about two steps in front of deceased. Witness's brother James then asked, "What do you mean, cursing and cutting up so?" Witness then told appellant to go away. Deceased then got up, with his knife in his right hand, which hung down by his

side. Witness went between the parties, and again told appellant to go away. Witness then passed on, and did not see the cutting. Saw that deceased had been stabbed, and heard him say that he was killed. Appellant was not employed at the mill, and had no business there.

On cross-examination, witness did not remember that he told his brother James to go away, or called him away, but might have done so. Deceased may have advanced towards appellant two steps, but witness is not positive. Did not see the deceased either strike or push the appellant. Bob Wiley was present. Appellant worked in witness's father's shop, about one hundred yards from the mill. Both appellant and deceased cursed each other.

Phelan Randolph, for the State, testified that at the time of the killing, appellant was working at Mr. Clinton Randolph's shop, near the mill. Witness, from what appellant had previously said to him, judged that he was very much displeased about the killing of his turkey, and seemed to think that he ought to have been paid for it. He had been working at the shop for about twelve months before the stabbing,

Bob Wiley, for the defendant, testified that at the time of the killing he was in the mill of Mr. Clinton Randolph, and from there saw a part of the difficulty. The hands had just quit work, but witness was getting extra pay to keep up a fire under the boiler. Deceased, James and John Randolph were lying on the ground near the mill, with their knives out, whittling. Appellant, who had been working at the shop, came by the mill and lit his pipe at the furnace, which he was in the habit of doing every evening after the day's work was over. He lived about one mile from the mill and workshop. After lighting his pipe, he went up to where deceased and the others were lying on the ground, and entered into a conversation with them. Witness did not hear any more of the talk before the difficulty than that the

appellant said he "ought to be paid for it." After some further conversation, witness heard appellant say, "As this is your dog, I will let you off;" to which the deceased responded, "You will have to." Appellant then said "somebody's dog might come up missing," and turned off. Deceased then said, "If you kill my dog, G—d d—n you, you will have to hunt your hole." Appellant then turned round and said, "Gentlemen, what I first said was in a joke; but, by G—d, I can let you know I am a man." James Randolph then got up, with his knife in his hand, and asked appellant what he wanted. Appellant then pulled out his knife and opened it. Deceased then got up and said, "You d—d black son of a b—h, do you draw your knife on me?" and advanced towards appellant with his knife in his hand. John Randolph called to his brother to have nothing to do with it. Witness did not see the killing, but saw appellant giving back. Deceased advanced on appellant, with his knife drawn, some twelve or fifteen feet. Saw deceased after he was cut. He went into the mill, and sent for his uncle, Clinton Randolph. Witness was then and is now in the employ of Clinton Randolph, at the mill.

On cross-examination, witness states that the reason he says it was twelve or fifteen feet that deceased advanced, is because it is that distance from where the difficulty first commenced to where the deceased was when he said he was killed. Appellant then picked up his hat and went off. Don't know that he went home; knows that he ran off, as he was arrested in Leon County; has not seen appellant since the difficulty until in court, at the time of the trial. Witness never told Phelan Randolph that he did not see the difficulty, and knew nothing about it; but did tell him that he did not see the killing. Has talked to no one about this affair until with Capt. Hightower (defendant's attorney), this morning. No one of the parties attempted to use his knife or cut the appellant, so far as witness knows. When

James Randolph got up, he did not advance on appellant, nor attempt to use his knife, but appellant did back off and open his knife.

It is deducible from the testimony that the appellant is a negro. The jury found him guilty of murder in the first degree.

*L. B. Hightower* and *J. R. Burnett*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

Ector, P. J.   The defendant was indicted for the offence of murder, charged to have been committed with express malice, and on the trial thereof was convicted of murder in the first degree, and adjudged to be executed. A motion was made for new trial, which was overruled; to which ruling the defendant excepted, and gave notice of appeal to this court.

The main question to be decided in this case is this : Does the evidence in the record make out a case of murder committed with express malice? In this State, all murder committed with express malice is murder in the first degree, and all murder not of the first degree is murder in the second degree.

"Express malice is where one with a sedate, deliberate mind, and formed design, doth kill another ; which formed design is evidenced by external circumstances discovering that inward intention, — as, lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." 4 Bla. Com. 198.

Where one man, with a cool, composed mind, in pursuance of a formed design to kill another, or to inflict upon him some serious bodily harm which would probably end in depriving him of life, does kill such person, in the absence of the circumstances which reduce the offence to negligent

homicide or manslaughter, or which excuse or justify the homicide, such killing would be a murder committed with express malice. In looking through the evidence in the record, we are not satisfied that it makes out a case of murder in the first degree under the law.

Because the verdict is against the weight of the evidence, the judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*